## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON
## CIVIL CASE NO: 05-31-JGW

**THE ESTATE OF**
**VICTORIA HELLMANN, ET AL.,**                                    **PLAINTIFFS**

**V.**

**KENTON COUNTY JAILER,**
**TERRY CARL, ET AL.,**                                    **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This litigation arises out of the death of Victoria Hellmann on February 12, 2004 at the Kenton County Jail. Plaintiffs, the estate and family of decedent, filed suit against defendants pursuant to 42 U.S.C. §1983, seeking monetary damages. On October 31, 2006, defendants moved for summary judgment on all claims. Plaintiffs timely filed their response on December 18, 2006, together with an affidavit of an inmate witness which was stricken from the record as improperly alleging new facts outside of the discovery period.[1] Defendants filed a reply in support of their motion for summary judgment on December 28, 2006. The parties have consented to final disposition of this litigation by the undersigned magistrate judge pursuant to 28 U.S.C. §636(c).

Based upon the undisputed facts of this case and applicable law, I conclude that summary judgment in favor of all defendants is appropriate.

---

[1]Plaintiffs were granted an extension of time in which to file their response. While portions of the response have been considered, the court has not considered any portion of the response devoted to the new allegations presented in the now-stricken affidavit.

## I. Facts and Relevant Standard

Summary judgment is only appropriate when there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.  In this instance, most of the facts of this case are undisputed.  To the extent that factual issues remain, the court has drawn all reasonable inferences and construed the facts in favor of the plaintiffs, as the party opposing summary judgment in this case.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986).   Because this case involves a tragic death at the jail, the facts are related in some detail.

At approximately 3:40 p.m. on February 12, 2004, Covington police received a report of two intoxicated persons arguing in the parking lot of a Frisch's restaurant.  Two officers responded and found Victoria Hellmann and Steven Woods in a vehicle.  DE #31, Ex. 1.  The officers arrested both for public intoxication in violation of KRS §525.100.  That statute prohibits appearing in public "manifestly under the influence of a controlled substance, or other intoxicating substance, excluding alcohol (unless the alcohol is present in combination with any of the above), not therapeutically administered, to the degree that he may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity."  Officer Lindemann believed Ms. Hellmann to be under the influence of narcotics (not alcohol) and a "danger to herself" based upon the fact that she was clearly intoxicated and was in a vehicle when arrested. DE #21, Lindemann Depo. at 37.  In the vehicle in which Hellmann and Woods were found, the officers located three vials of prescription narcotics:  Alprazolam, Zoloft and Trazodone.

New arrestees arriving at the Kenton County Detention Center ("KCDC") typically undergo a "medical screening inquiry" as required by state law.  At the KCDC, inmates are

2

asked a series of questions contained on an "Inmate Medical Form" during the initial "booking"
process.

When Ms. Hellmann arrived at the jail at approximately 4:20 p.m. her eyes were
bloodshot, her walk was staggered, movements were "sluggish" and her speech was slurred and
slow.  DE #31, Ex. 3, 4.  Inmate Hellmann appeared to be more intoxicated than her companion,
"by sweating" and "falling asleep in between conversation" with detainee Woods about their
children. *Id.*, Ex. 4.   Observing this, Deputy Jonathon Colwell, the intake officer, asked both
Hellmann and Woods if they had any drugs or weapons in their possession, if they needed
medical attention, and if they had any medical conditions.  Both responded negatively.  *Id.*, Ex.
3.  Hellmann and Woods walked of their own accord approximately thirty feet from the gate of
the facility to the intake area in the trailer, carrying on a conversation about their daughter.  *Id.*

Deputy Colwell proceeded to book Woods while a female deputy, Taryn Pence, began
booking Ms. Hellmann.  DE #31, Ex. 2.  Completing a medical questionnaire during his intake
interview, Mr. Woods denied being on any medication.  *Id.*, Ex. 14.

Ms. Hellmann continued to appear to be "falling asleep."  *Id.,* Ex. 3, 4.   Deputy
Hoffmeister described her as able to walk and speak "with hesitation," but also noted that she
"kept falling asleep" during the interview, although her  breathing was "normal."  *Id.*, Ex. 5.  A
data clerk, Heather Hanlon, observed that Ms. Hellmann seemed to have breathing problems, and
inquired repeatedly if Ms. Hellmann was okay.  Ms. Hellmann replied affirmatively at least
twice, explaining, "yes m'am, its my anxiety." *Id.,* Ex. 14 and DE #16, Att. 9 (Hanlon).  When
Deputy Colwell called her name, Hellmann appeared to awake, saying "I'm not sleeping, sir."
*Id.*  Data Entry Clerk Bobbie Shay reported that when the intake clerks asked her questions, Ms.

3

Hellmann would "look up for a moment, then went asleep as though she didn't hear us," with "saliva running down her chin." DE #16, Attachment 9, Exh. 4 Internal Affairs Report, Extraordinary Incident Narrative page II.  Shay also reported that when asked to stand up in order to be patted down by Deputy Pence, Ms. Hellmann stood up on her own "without any problems other than being slow." *Id.*

In light of Ms. Hellmann's propensity to doze off, Deputy Colwell contacted the shift commander, Sergeant Werner Stilt.  Sgt. Stilt observed that Hellmann was "nodding off" not unlike other intoxicated arrestees he had observed in the past, but that she was able to walk under her own power. Due to the level of Ms. Hellmann's intoxication and her apparent inability to participate in the booking process, Sgt Stilt made the decision to "quick book" Ms. Hellman, a procedure whereby arrest information and personal property is entered into the data system but the inmate is returned to complete the full booking process at a later time, including "fingerprints, Photographs, and the Intake Interview."  DE #31, Ex. 11, ¶¶ 3-4.  Sgt. Stilt instructed Deputies Pence and Colwell to take Ms. Hellmann to the female intake cell (Cell 055) to "sleep it off," and to complete the booking process once she sobered up.  DE #16, Attachment 9 (Shay).

Deputy Pence proceeded with Deputy Hoffmeister and inmate Hellmann out of the booking trailer and down the stairs to the female intake area.  DE #31, Ex. 4.  During the transport the deputies reported Ms. Hellmann to be "alert and happy," able to walk independently under her own power, "compliant with all orders," and able to communicate with them, asking if she could use the phone to call someone to pick up her children from school and reporting that she felt "fine." *Id.*, Ex. 4, 5, 14.

When Ms. Hellmann arrived in the female intake area at approximately 4:45 p.m., Deputy Barbara Edwards observed that she was "a little unsteady on her feet," that her speech was slurred, and that she had "a silly grin" on her face. Edwards Deposition at 19-20. Deputy Pence advised Edwards that Ms. Hellmann had not been fully processed at intake due to her level of intoxicants and inability to stay awake. DE #31, Ex. 4. Based upon her experience with other arrestees who exhibited similar behavior, Deputy Edwards deduced that Hellmann was under the influence of alcohol. When Deputy Edwards asked Hellmann if she had been drinking, Hellmann responded, "yes, with a big grin on her face." Hellmann also stated that she had taken three Xanax tablets, but that she was "fine." *Id.*

Deputies Pence and Edwards placed Hellmann in a cell, where she sat down without falling. *Id.,* Ex. 11. At approximately 5:40 p.m. Deputy Jamie Mullins attempted to serve Hellmann an evening meal and reported that she was "snoring loudly, and breathing normally." Ex. 11, ¶ 7. An inmate helping to deliver meals, Allen Freeman, stated that Deputy Edwards and he attempted to wake Hellmann when they delivered her meal but were unsuccessful, and that Deputy Edwards counseled him to "let her sleep it off."DE #16, Att. 9.

Around 6 p.m. while making her rounds, Deputy Edwards heard an unusual noise coming from the holding cell. Upon entering to investigate, she found Hellmann laying on the floor and snoring. Concerned about the heavy sound of Hellmann's breathing, Deputy Edwards called the medical department and requested a medical assessment from Tamara Smith, a nurse.

Prior to Smith's arrival, Deputy Edwards saw defendant Lynn Kloeker in the female intake area. Kloeker was a certified medical assistant ("CMA") and was dispensing scheduled medications. Deputy Edwards asked Kloeker to go evaluate Hellmann, telling Kloeker that

Hellmann had taken "pills and alcohol," that she was sleeping and breathing heavily, and that other detainees had complained that Hellmann was "smelly."   DE #24, Kloeker Deposition at 16.

At approximately 6:15 p.m., Kloeker went to the holding cell, got down on her hands and knees, and moved Hellmann's hair in order to better examine her head and face.  Kloeker perceived what she believed to be an odor of alcohol and deemed Hellmann's slightly labored breathing to be normal for a person who, like Hellmann, was overweight.[2]  DE #16, Att. 9 (Kloeker).   Kloeker testified that she checked Hellmann's mouth and nose for obstructions, and checked her lips and nailbeds for any discoloration to determine if Hellmann's body was taking in sufficient oxygen.  As Kloeker examined Hellmann, Hellmann rolled her neck and made a grunting noise.  Kloeker concluded that Hellmann was snoring but was otherwise merely "sleeping off" her intoxication and not in any medical distress.  DE #16, Att. 9, DE #24, Kloeker Deposition at 20-21, 32-34.

Minutes later, the inmates in Ms. Hellmann's cell became concerned about Ms. Hellmann's breathing.  They checked on her and began yelling for help because she did not appear to be breathing.  At approximately 6:20 p.m., Deputy Edwards heard the detainees yelling and responded immediately.  The detainees told her that Hellmann was not breathing.   Deputy Edwards radioed Sgt. Stilt and medical staff for immediate assistance while attempting unsuccessfully to move Hellmann into a sitting position.  Finding Hellmann too heavy to move, Deputy Edwards asked a male inmate trustee to assist her.  DE #31, Ex. 11.  Unable to move

---

[2]Jail records record Ms. Hellmann's height as 5' 3", with her weight at 160 pounds. DE #31, Ex. 2.

Hellmann into a sitting position, Edwards and two male assistants instead placed Hellmann on

her back to perform CPR at approximately 6:25 p.m.  *Id.,* Ex. 7, 8.  In short order, other deputies

and Sgt. Silt arrived to assist.  Deputies Pence and Hoffmeister were among the first responding

jail personnel and observed and assisted with the administration of CPR.  *Id.*, Ex. 4, 6.  Sgt. Stilt

radioed for Deputy Colwell to call 911.  The City of Covington's Fire Department arrived with

EMTs at approximately 6:30 p.m.  *Id.,* Ex. 11.  The Life-Squad staff continued CPR and

transported Hellmann to St. Elizabeth's North at approximately 6:48 p.m., where efforts to

revive her were unsuccessful.  *Id.*, Ex. 8.

Chief Deputy Rodney Ballard went to the hospital to monitor Hellmann's condition.

When it became apparent that Hellmann's death was likely the result of a drug overdose, Chief

Dpeuty Ballard ordered KCDC staff to transport Hellmann's companion, Mr. Woods, to the

hospital for assessment.  *Id.*, Ex. 12.  Mr. Woods initially denied having engaged in drinking or

drug taking.  *Id.*, Ex. 14.  However, after arriving at the hospital, he admitted to his brother in

Chief Deputy Ballard's presence that he and Hellmann had each crushed and snorted "a 40

Oxycontin" in order to manipulate the time-release mechanism and intensify the effects of the

drug.  *Id.*, Ex. 12.  An autopsy report listed Ms. Hellmann's cause of death as "Toxic effects of

Ingested drugs due to (or as a consequence of) Oxycodone (0.38 mg/l) Methadone (O.15 mg/l)."

*Id.*, Ex. 10.  No alcohol was detected in the decedent's blood. *Id.*  The level of oxycodone in

Hellmann's system at the time of her death was approximately 20 times the level that would

have been expected at the peak concentration had Hellmann taken the highest available

prescribed dose (10 mg) in tablet form.  At no time prior to her death had Ms. Hellmann or Mr.

Woods informed anyone at the jail that they had ingested oxycodone in any form; none of the

prescription bottles found in Woods's car contained oxycodone.

According to jail records, Victoria Hellmann had been arrested and transported to the KCDC on four separate occasions in the year prior to her February 12, 2004 arrest. Three prior Inmate Medical Forms would have been available on the computer system to an intake clerk. Because of the abbreviated booking process used on February 12, there is no evidence that any person at the jail had knowledge of the prior data.

Had it been accessed, the prior data would have shown that on May 11, 2003, Ms. Hellmann reported having been treated for mental illness or emotional problems, that she suffered from fainting spells and possibly epilepsy, and that she was taking the following prescriptions: Prozac, Depakote, Zyprexin, Remaron, Xanax and Reglan. No Inmate Medical Form was located for a May 31, 2003 incarceration. On September 22, 2003, Ms. Hellmann advised that she had been treated for mental illness, was thinking of harming herself or others, and was taking the prescriptions Alprazolam, Prozac, Zyprexin, and Depakote. On October 15, 2003, Ms. Hellmann reported that she had been treated for bipolar disorder, depression, and an anxiety disorder; that she was thinking of harming herself or others; and that she was taking the prescription Alprazolam (identified as a generic form of Xanax). None of the prior intake information showed any use of the non-prescribed medications which caused Ms. Hellmann's death, including Oxycodone and Methadone.

Ms. Hellmann's estate and her two sons, Nicholas and Bryan Hellmann (hereinafter collectively referred to as "the Estate")[3] filed this action against (remaining) defendants Kenton

---

[3]Although attorney Debbie Feldmann initially filed a "notice of representation" concerning Kenneth Steenken, Mr. Steenken was never a named plaintiff in this litigation.

County Jailer Terry Carl, Kenton County Detention Center Deputy Barbara Edwards, and

Kenton County medical staff, Tamara Smith and Lynn Kloeker.[4]  All defendants are named in

both their official and individual capacities.  Pursuant to 42 U.S.C. §1983, the Estate alleges that

defendants violated Hellmann's federal constitutional rights by exhibiting deliberate indifference

to her medical needs, as well as her rights under an unspecified provision of the Kentucky

Constitution.  In a third claim, the Estate asserts a cause of action under state law for wrongful

death.

### II. Analysis

The court is not without sympathy for the sad fact that Ms. Hellmann died at the jail.  In

the end, though, the law recognizes that not every death - even one that may have been

preventable - should result in liability against public officials who lacked any subjective or

objective intent to do harm, and whose only error was in failing to recognize the difference

between a level of intoxication that could be "slept off," and a level of intoxication that would

prove to be fatal.

The national disaster known as drug and alcohol abuse and addiction results in the

condition of intoxication being a relatively common one in pretrial detainees.  To date, no court

has held that the Constitution requires intoxicated inmates to be provided with a full medical

evaluation and care where jail personnel have no knowledge that the level of  intoxication poses

a serious threat to the health or safety of the individual.   Only cases in which a defendant fails to

---

[4]The original complaint also named Kenton County Judge Executive Ralph Drees and Kenton County Commissioners Barbara Black, Adam Koenig, and Daniel Humpert.  All of those defendants were dismissed in both their official and individual capacities by stipulation.  *See* DE #30, 8/03/06.

act in the face of clear knowledge that the level of intoxication may be dangerous - such as a highly intoxicated and obviously ill inmate released to deputies against medical advice, or an adolescent suspected to have swallowed a dangerous level of crack cocaine - survive summary judgment. *See Thomas v. City of Shaker Heights*, 2006 WL 160303 (N.D. Ohio 2006)(jail officials cancelled life squad)(unpublished); *Pryor v. Dearborn Police Department*, 452 F. Supp.2d 714 (E.D. Mich. 2006)(evidence that officers knew 16-year-old arrestee had ingested "a ton" of cocaine and it was "obvious to a layperson" he was suffering from a drug overdose and needed immediate medical help).  By contrast, the defendants herein are entitled to summary judgment because the plaintiffs have failed to prove that any of the defendants had sufficient knowledge of the potential dangerousness of Ms. Hellmann's condition to put them on notice that immediate medical attention was required.

The defendants specifically argue that they are entitled to judgment: 1) for procedural reasons and/or because of plaintiffs' concessions; 2) because plaintiffs have failed to identify the violation of any specific right under the United States Constitution or Kentucky law, and there was no violation of the Fourteenth Amendment deliberate indifference standard; 3) because no County policy was the moving force behind any Constitutional violation; 4) because defendants are entitled to qualified immunity;  5) based upon state law defenses of good faith immunity and the existence of a superseding cause.  Each of these arguments will be addressed *in seriatim*.

### A.  Procedural Issues

Before turning to the merits, the court will address defendants' procedural arguments.

### 1. Tamara Smith's Claim of Failure of Service

Defendants assert that defendant Tamara Smith was never served with a copy of the

complaint.  Plaintiffs have failed to respond to this argument.  However, the record reflects that attorney Mary Ann Stewart filed a "motion for an extension of time in which to answer or otherwise plead" on behalf of *all* defendants [which included Ms. Smith] on February 23, 2005.  On March 18, 2005, defense counsel filed an answer which in its caption and initial paragraph refers only to defendants "Terry Carl, Lynn Kloeker and Barbara Edwards."  Nevertheless, the body of the answer responds and admits certain allegations against "Defendant, Tamra Smith" "in her official capacity or individual capacity."  Answer, ¶8.   In light of the admissions in defendants' answer, the court declines to dismiss claims against defendant Tamara Smith based upon failure of service.

### 2.  Terry Carl and Barbara Edwards

Plaintiffs concede that defendants Terry Carl and Barbara Edwards are entitled to summary judgment in their *individual* capacities.  Therefore, summary judgment will be granted as to claims against these two defendants in their individual capacities.

### B.  Identification of Specific Constitutional Rights

To establish a claim under 42 U.S.C. §1983, a plaintiff must "identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law."  *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992).  Defendants argue that they are entitled to summary judgment in both individual and official capacities because plaintiffs have failed to identify any cognizable claim under the United States Constitution.   The first claim of plaintiffs' complaint, captioned simply "First Claim - Federal Constitution" alleges that defendants have deprived Ms. Hellmann of her "rights, privileges, and immunities secured under the Federal Constitution, including, inter alia, the *Eighth Amendment* to the Federal

11

Constitution." (Emphasis added). However, the Eighth Amendment does not apply to pretrial detainees such as Ms. Hellmann. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979 (1983).

In response, plaintiffs argue that the reference to the Eighth Amendment "is not limiting," because the claim is for a deprivation of rights under all relevant provisions of the United States Constitution. Alternatively, plaintiffs seek to amend their complaint to specifically reference to the Fourteenth Amendment. Under the Fourteenth Amendment, pretrial detainees have a due process right to adequate medical treatment that is considered "analogous" to the Eighth Amendment rights of prisoners. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-686 (6th Cir. 2002). The court will deny plaintiffs' construed motion to amend their complaint only because even under the more properly identified Fourteenth Amendment, the defendants would be entitled to summary judgment; therefore, amendment would be futile.

### 1. Fourteenth Amendment Deliberate Indifference Standard

To show a violation of a detainee's rights under the Fourteenth Amendment, the plaintiffs must show that the defendants acted with "deliberate indifference" to Ms. Hellmann's medical needs. Proof of deliberate indifference requires more than a mere showing of negligence, and requires at a minimum that the named defendants were actually aware of a danger and consciously disregarded it. The standard has been described as akin to "criminal recklessness," *Weaver v. Shadoan* 340 F.3d 398, 410 (6th Cir. 2003), which exceeds gross negligence. *See also Ross v. Duggan*, 402 F.3d 575, 590 n. 7 (6th Cir. 2004). The test has both an objective and a subjective component: "the detainee must be subjected to a substantial risk of serious harm, and the prison official must actually know of and disregard the risk." *Brown v. Bargery*, 207 F.3d

863, 867 (6ᵗʰ Cir. 2000).

The Sixth Circuit's application of the relevant standard in *Watkins v. City of Battle Creek*

is instructive:

> Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [plaintiff's] health and safety. *Farmer v. Brennan,* 511 U.S. 825, 835-37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This standard is subjective. It is not enough that there was a danger of which an officer should objectively have been aware. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments. *Id.* at 837-38, 114 S.Ct. 1970.
>
> Thus, it is not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies *should have* known that Watkins had swallowed drugs. We find the evidence was not sufficient to lead a rational trier of fact to conclude that the officers or jailers knew Watkins needed medical attention for swallowing drugs. None of the police officers at the apartment saw Watkins swallow drugs. When the possibility was raised as a result of his drooling, the officers took care to advise Watkins that ingesting drugs could be deadly, that they would take him for medical treatment, and that he would not face any additional charges if he had swallowed drugs. Watkins repeatedly denied swallowing drugs, provided rational explanations for his behavior, and did not want medical treatment. He did not say anything about swallowing drugs to the transport officer, who was an acquaintance, but instead was concerned that she would think badly of him for being arrested.ᶠᴺ³

1. FN3. Plaintiff also argues the supervisors negligently failed to inquire about whether drugs could have been swallowed when they saw the plastic bag in the closet. Mere negligence, however, is not enough to establish an Eighth or Fourteenth Amendment violation. *Farmer,* 511 U.S. at 835, 114 S.Ct. 1970.

> In spite of having no forewarning, jail personnel reacted to Watkins's behavior and asked him if he had swallowed any drugs. They also assured him both that he would not face additional charges and that they would get him medical treatment if he had swallowed any drugs. Watkins continued to deny the need for medical treatment and offered an explanation for why he was feeling sick to his stomach. While the one deputy who said he would check on Watkins failed to do so, Watkins was nonetheless kept under

13

observation and his movements were noted by other officers. This case does not involve
an incapacitated detainee or one who asked for but was refused medical treatment.
Plaintiff faults defendants for not forcing medical treatment on Watkins in the face of his
repeated denials and plausible explanations. We find that this is insufficient to establish a
question of fact on the issue of deliberate indifference. Summary judgment was properly
entered in favor of defendants on these claims.

*Watkins v. City of Battle Creek*, 273 F.3d at 686. Similar to the signs of intoxication in this case,

in *Watkins* the pretrial detainee had complained of upset stomach and appeared to be drunk or

high, and was observed falling from chair onto floor and making chewing motions with his

mouth when admitted. However, he continued to deny he had swallowed drugs and explained

his behavior by stating that his stomach was upset from drinking alcohol and smoking marijuana.

He later died in a cell from swallowing cocaine.

### a. Lack of Evidence of Substantial Risk of Serious Harm

As in *Watkins*, defendants argue that they are entitled to summary judgment because

there is no dispute that anyone at the jail- much less a named defendant- knew that Ms.

Hellmann had ingested oxycodone or methadone, or any dangerous level of any illicit or

prescribed drug. Like Watkins, the decedent in this case did not alert jail personnel to the

seriousness of her condition. During the abbreviated intake process, she explained her breathing

as resulting from her "anxiety" but affirmed that she was otherwise "o.k.,"and denied needing

any medical attention. Although she later admitted to ingesting three tablets of Xanax and

alcohol (which she had not taken), she never informed anyone that she had ingested oxycodone

and/or methadone.

Plaintiffs assert that such specific knowledge was not required because Ms. Hellmann

was a "known drug addict." However, there is absolutely no evidence in the record that the

14

decedent was known to be a "drug addict."  None of Ms. Hellmann's prior arrest records, which undisputedly were *not* accessed by any named defendant, reflect anything more than that she was prescribed a variety of medications over the year prior to her death.  The most recent medical screening form shows that Ms. Hellmann had been prescribed only one medication, Alprazolam (identified as a generic form of Xanax), some four months prior to her February 14, 2004 arrest. The three prescription medications discovered in the car with Ms. Hellmann upon her arrest included Xanax, which she admitted to ingesting, and two other medications which did not include oxycodone or methadone.   There is no evidence that any defendant had *any* information that Ms. Hellmann was a "drug addict," or knowledge of any medical history to suggest that she required immediate medical attention.

Although plaintiffs offer no evidence that anyone had knowledge that the decedent had ingested a lethal combination of drugs, plaintiffs additionally argue that such knowledge was not required in the face of Ms. Hellmann's obvious state of intoxication.  However, plaintiffs cite no authority suggesting that a detention facility must provide medical attention to any arrestee it knows or suspects to be intoxicated on drugs.  Indeed, recent case law is replete with examples from which the opposite conclusion may be drawn.  For example, in *Schack v. City of Taylor*, 177 Fed. Appx. 469 (6th Cir. 2006)(unpublished, text available on Westlaw), the Sixth Circuit affirmed the trial court's grant of summary judgment to the defendants in a case in which a highly intoxicated detainee was fatally injured when he fell after attempting to stand in a holding cell.  The court held: "Placing an intoxicated man, even a highly intoxicated man, in a detoxification cell while awaiting booking does not violate contemporary standards of decency." *Id.* (citations omitted).  The court explained that the defendants' conduct did not rise to the level

of deliberate indifference because "recognition of an *increased* risk of [plaintiff] *falling* is not equivalent to recognition of a *substantial* risk of *serious* harm." *Id.* (emphasis original). Similarly, in *Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999) the Fourth Circuit rejected a Fourteenth Amendment claim based upon the defendants' decision to place a drug-intoxicated arrestee in a cell to "sleep it off."

> To accept appellant's claim would be to mandate as a matter of constitutional law that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers. That would be a startling step to take.

*Id.* Yet another example is found in *Estate of Abdel-Hak v. City of Dearborn*, 872 F.2d 1023 (6th Cir. 1989)(unpublished, text available on Westlaw), where the court affirmed summary judgment when an obviously intoxicated and agitated detainee was placed in a holding cell. Officers checked and observed the detainee's pulse and respiration after he appeared to pass out; the detainee - who had ingested cocaine unbeknownst to officers - later died. The court described as "meritless" the plaintiff's argument that "police had a duty to take all chemically impaired persons to the hospital." *Id.*

Case law necessarily reflects evolving standards of medical care. The day may yet come where a failure to have medical personnel evaluate a severely intoxicated detainee is deemed Constitutionally deficient under the "deliberate indifference"standard, but that day- should it arise- clearly lies in the future. *See also Beyer v. City of Johnson City*, 2003 WL 23737298 (E.D. Tenn. 2003)(the Constitution does not require jails "to have doctors available upon booking to determine if an intoxicated prisoner may be incarcerated or should be taken to the hospital"); *Butler v. Coitsville Township Police*, 93 F. Supp.2d 862 (N.D. Ohio 2000)(detainee's

16

slurred speech and unsteadiness during arrest did not make potential of alcohol seizure so obvious as to mandate medical attention, no deliberate indifference even though detainee later suffered alcohol seizure and fell, causing fatal head injury); *Samples v. Logan County*, 2006 U.S. Dist. LEXIS 320, 2006 WL 39265 (S.D. Ohio Jan. 6, 2006)(noting procedure where "if an inmate is too intoxicated to participate meaningfully in this booking process, the booking officer gives the inmate time to sober up"); *Weaver v. Shadoan* 340 F.3d 398 (officers put a man in a cell where the man was mumbling and had to be assisted by two jailers into the jail); *Ross v. Meyers*, 883 F.2d 486, 487 (6th Cir. 1989)(intoxicated arrestee placed in holding cell).

### b. Actual Disregard/ Failure to Render Care

Even if the defendants were unaware of Ms. Hellmann's condition at the time of booking, plaintiffs argue that the defendants' subsequent actions rose to the level of deliberate indifference when the defendants failed to render adequate medical care as Ms. Hellmann's condition worsened.  As evidence of the subjective component of their claim, plaintiffs point to a statement by inmate witness Billie Antoun[5] in the Internal Affairs Report.  According to Antoun, while the decedent was lying in the holding cell:

> a nurse arrived and showed very little concern about Ms. Hellmann.  Ms. Antoun advised that Deputy Edwards was noticeably upset about her disconcern. Detective Scroggins discovered in a later interview that the first nurse who responded was actually a CMA (Certified Medical Assistant)."

The parties agree that the CMA to which the report refers is defendant Kloeker.  Kloeker had

---

[5]Much of plaintiffs' response relies upon an affidavit by Billie Antoun, which affidavit has been stricken from the record and is not further considered by this court.  *See* DE #44, Memorandum Order of 2/5/07.

been asked to check on inmate Hellmann by Edwards, who advised her that Hellmann had ingested "pills and alcohol" and was breathing or snoring heavily.  Defendant Kloeker responded to the request by entering Ms. Hellmann's cell.  Kloeker testified that she rendered a medical evaluation and determined that Hellmann was not in any danger.

Plaintiffs do not dispute that this medical evaluation would entitle defendant Kloeker to summary judgment if it occurred.  However, plaintiffs argue that a genuine issue of material fact exists "as to whether or not Kloeker rendered medical aid, as she testified," noting Ms. Antoun's reference in the Internal Affairs Report to Kloeker's "disconcern."

This brief reference to a "nurse" showing "very little concern about Ms. Hellmann" is insufficient to deprive the defendant of summary judgment.  A statement that Ms. Kloeker "showed very little concern" simply is not inconsistent with Ms. Kloeker's own testimony that she performed a medical evaluation but left the cell after determining that Hellmann was not in any danger.  Even if Ms. Kloeker's "attitude" at the time left something to be desired, her uncontroverted testimony that she performed a basic medical evaluation relieves her from liability under the "deliberate indifference" standard.

Even if defendant Kloeker "could" have inferred from Hellmann's breathing that she was at a substantial risk of harm, there is no evidence that Kloeker actually drew such an inference.  Absent evidence that Kloeker both knew of facts from which she could infer that a substantial risk of serious harm existed *and* that she drew that inference and consciously disregarded it by refusing Hellmann medical care, she is entitled to summary judgment.  Plaintiffs concede that the other individual defendants had even less knowledge of Hellmann's condition.

Courts have consistently held that an error in judgment or even appreciation of an

18

increased risk does not arise to a constitutional violation. Many of the relevant cases are unpublished but their numbers and consistent holdings are persuasive. For example, in *Speers v. County of Berrien*, 196 Fed. Appx. 390 (6th Cir. 2006)(unpublished), a detainee with a blood alcohol level of .227 was placed in "drunk tank" cell, examined by medical doctor and prescribed medication to treat alcohol withdrawal but later died. The court affirmed the grant of summary judgment to the majority of guards, who believed that the detainee was suffering only from "general alcohol withdrawal, which typically may be managed in a prison setting and indeed frequently is managed there." The court denied summary judgment only to two individual guards who observed the detainee acting strangely, and allegedly were told that he was foaming at the mouth, had a strange look, had collapsed and was twitching but did not seek medical attention. *See also Butler v. City of Pontiac*, 2006 WL 2087627 (E.D. Mich. 2006)(defendants entitled to summary judgment where plaintiff failed to show subjective component of deliberate indifference claim. Although decedent died from "complications of drug abuse," plaintiff showed only that defendant officers were in close proximity to the decedent, with no evidence that any defendant heard any call for help and ignored it); *accord Schack v. City of Taylor*, 177 Fed. Appx. 469 (6th Cir. 2006)(no deliberate indifference in placing severely intoxicated detainee in cell to sober up prior to processing); *Grayson v. Peed*, 195 F.3d at 695 (4th Cir. 1999)(error in judgment in assuming that intoxicated individual needed nothing more than to sleep it off did not result in liability).

## 2. Kentucky Constitution

In addition to arguing that defendants violated the decedent's rights under the Fourteenth Amendment to the United States Constitution, plaintiffs point to the same evidence to argue that

the defendants violated her rights under an unspecified provision or provisions of "the Kentucky Constitution."   As defendants point out, the Kentucky Constitution has more than 250 sections containing innumerable "rights" that could be derived from those sections.  Plaintiffs' generic reference to the Kentucky Constitution is insufficient to state a claim even under the liberal standard of notice pleading.  To the extent that plaintiffs' claims under the Kentucky Constitution are based upon the same protections afforded to pretrial detainees under the Fourteenth Amendment of the United States Constitution, the defendants are entitled to judgment as a matter of law for the reasons stated above.

### C.  County Policy

### 1.  Lack of Constitutional Violation

"If no constitutional violation by the individual defendants is established, the [governmental] defendants cannot be held liable under §1983."  *Watkins*, 273 F.3d at 687.  The "conclusion that no officer-defendant had deprived the plaintiff of any constitutional right *a fortiori* defeats the claim against the County as well."  *Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000); *see also Bukowski v. City of Toledo*, 326 F.3d 702, 712-713 (6th Cir. 2003).  The Estate's failure to demonstrate that any individual defendant deprived Ms. Hellmann of a Constitutional right entitles the County to summary judgment as well.

### 2.  Policy Asserted

### a.  Quick Booking "Policy"

Even absent individual liability, plaintiffs argue that an unconstitutional "policy" of "quick booking" intoxicated detainees  was the "moving force" behind the alleged deprivation of

Ms. Hellmann's right to adequate medical care.   The County first denies that evidence exists of any policy or custom of "quick-booking," in which an arrestee is placed in a holding cell prior to completion of a medical screening intake form.  Indeed, it is undisputed that no *written* policy of quick-booking exists in Kenton County records.  Rather, the County's written policy *requires* that arrestees receive medical screening before being placed in a cell in the Detention Center.

Plaintiffs respond that quick-booking was a commonly used practice or custom. Defendants concede that a policy can include "a governmental custom that has not received formal approval through the body's official decision-making channels."  *City of Canton v. Harris*, 489 U.S. 378 (1989).  A "custom" is a practice that is "so permanent and well settled as to constitute a custom or usage with the force of law."  *Doe v. Claiborne Co.*, 103 F.3d 495 (6th Cir. 1996).

Defendants argue that plaintiffs cannot show that the use of "quick booking" was anything other than a one-time occurrence.  However, plaintiffs point to testimony by Deputy Colvin that "quick booking" is often used when an inmate is drunk, threatening, or otherwise uncooperative.  DE #28, Colvin Deposition at 46-47; Carl Deposition at 58-71.   I conclude that plaintiffs' evidence is sufficient to show the existence of a "policy" - at least at the summary judgment stage.   In deposition testimony, jail officials testified that the practice of "quick booking" is very commonly used at the Detention Center, and was not an isolated occurrence.

### b.  Official Knowledge of Quick-Booking "Custom"

Defendants alternatively argue that they are entitled to summary judgment even if "quick booking" was a common practice, because final policymaking authority for the medical care in

county jails lies with the county's fiscal court, and not the elected jailer.  When a "custom" has not been formally adopted, a plaintiff must still show that the policymaking officials know of and acquiesce in the established practice.  *Miller v. Calhoun Co.*, 408 F.3d 803 (6th Cir. 2005). In this instance, defendants contend that the plaintiffs have failed to demonstrate that the Kenton County Fiscal Court was aware of or acquiesced in the practice of "quick booking."

I agree that the Estate has failed to make the requisite showing in this case; therefore, the defendants are entitled to summary judgment on this ground.  *See Thomas v. City of Shaker Heights*, 2006 WL 160303 (N.D. Ohio 2006)(unpublished)(city entitled to summary judgment because plaintiff failed to identify clear and persistent pattern of deliberate indifference to pretrial detainees suffering from alcohol related problems, that City had constructive notice of clear pattern; that City tacitly approved of the unconstitutional conduct, and that the city was the "moving force" in the constitutional deprivation).

### c.  Policy as a "Moving Force"

The County is also entitled to summary judgment on the Estate's §1983 claim because the plaintiffs have failed to show that the policy of "quick booking" was the "moving force" behind the alleged Constitutional deprivation.   In this case, the only remaining allegation is that defendant Kloeker failed to recognize a serious medical need based on her actual knowledge and observations.  But the policy of which the Estate complains was the failure to complete a medical screening form.  Two prerequisites would have had to occur to link the "policy" to Kloeker's actions; 1) the decedent would have had to accurately communicate her medical status, and 2) that status would have had to have been communicated to defendant Kloeker.

To establish this link, plaintiffs rely in part on the anticipated testimony of their expert,

22

Victor Lofgreen.  Dr. Lofgreen has a PhD in criminal justice and is identified as a "Correctional Forensic Case Analyst."  Dr. Lofgreen opined in correspondence to plaintiff's counsel dated July 7, 2006 that from his preliminary review of unspecified documents, "[t]he lack of proper adherence to established admissions screening policy and procedure and the continued staff inattention to her deteriorating medical condition is likely to be a primary supporting cause of her death."  Dr. Lofgreen further opines that the decedent's "medical needs would have been noted by a proper intake medical review at the time she was admitted to the detention facility," and that [h]ad her condition been noted at that time she could have received appropriate medical care to stabilized [sic] her condition and allow her to continue to live."

In response, defendants have filed as an exhibit the report of their expert, Sharon L. Walsh, Ph.D., Professor of Behavioral Sciences & Psychiatry and Executive Director of the Center on Drug and Alcohol Research at the University of Kentucky.  Dr. Walsh opines that Ms. Hellmann's observed slurred speech and sedation "could be produced by the benzodiazepine sedatives" which Ms. Hellmann had admitted to using.  "[G]iven her representation of symptoms, there would be no reason to disbelieve her self-reported drug use" (of Xanax), which use "would not typically require medical intervention in an experienced drug user."  Ex. 14.

The parties do not dispute that because of the quick booking procedure used on Ms. Hellmann, the medical screening was not performed.  Carl Deposition at 56.  Plaintiffs contend that had Ms. Hellmann completed the "inmate medical screening" form, that information "*presumably* would have alerted medical staff as to a potential problem."  (Emphasis added). However, plaintiffs' and their expert's "presumption" is speculative at best.  There is no evidence that Ms. Hellmann would have responded accurately to the questions required on the

23

inmate medical screening form when she had already denied ingesting illicit drugs, had stated

that she felt "fine" and did not require medical attention, admitted ingesting only alcohol and

three Xanax pills.   DE #31, Ex. 3; Colwell Deposition at 23.  It is undisputed that Hellmann was

intoxicated and inattentive during the booking process, compromising her ability to provide

accurate and complete medical information.

Although the Ninth Circuit has held that a county's written policy of delayed medical

screening poses a substantial risk of serious harm to detainees sufficient to support a claim under

§1983, *see Gibson v. County of Washoe,* 290 F.3d 1175 (9th Cir. 2002), I reach the opposite

conclusion in this case.  Here, the Estate can only speculate on whether Hellmann would have

been admitted to the Detention Center if a full medical screening form had been completed.

There is no evidence to suggest that she would have related accurate information, or that the

information would have been communicated to defendant Kloeker and enabled her to recognize

the medical emergency presented by Ms. Hellmann's condition.   Plaintiffs' assumptions are

simply too speculative to support a causal nexus between the asserted policy and Ms.

Hellmann's death.  *See Linden v. Washtenaw County*, 167 Fed. Appx. 410, 417-418, 2006 WL

45243 (6th Cir. 2006)(denying claim because plaintiff's arguments "rely on conjecture and offer

nothing more than ephemeral hopes that a possibly-taken action ...could have averted [the

decedent's] death").

### D.  Qualified Immunity

Qualified immunity "shields public officials acting within the scope of their official

duties from civil liability."  *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73

L.Ed.2d 396 (1982).  Along with many other courts, the Sixth Circuit has explained:

24

Qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell,* 472 U.S. at 526, 105 S.Ct. 2806 (emphasis in original). The Supreme Court has emphasized that questions of qualified immunity should be resolved "at the earliest possible stage in the litigation." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). The Supreme Court has recently set forth a two-prong test that must be applied to a qualified immunity analysis. *Id.*

The first prong is a threshold question, namely: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* If the answer is in the negative, then the inquiry ends.

*Weaver v. Shadoan*, 340 F.3d at 406.   This court need not address the second prong of the qualified immunity analysis because the defendants' conduct did not violate Hellmann's rights under the Fourteenth Amendment on the facts presented.   Ms. Hellmann's intoxicated state gave rise to no more than "the mere suspicion of a risk of harm" which is "insufficient as a matter of law to give rise to liability for deliberate indifference" *Weaver*, 340 F.3d at 412, n.11 (rejecting liability where record at best supported an inference that officer suspected that the decedent had consumed drugs).

### E.  Defenses Under State Law

### 1.  Good Faith Immunity

The Estate argues that Antoun's statement in the Internal Affairs Report at least supports a claim for negligence against defendant Kloeker.   However, in *Yanero v. Davis*, 65 S.W.3d 510, 523 (2001), the Kentucky Supreme Court held that public officers and employees are immune from damages liability for "good faith judgment calls that occur in a legally uncertain environment."

25

> Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment (2) in good faith; and (3) within the scope of the employee's authority.

*Id.* Based upon the evidence presented, all of the defendants including Kloeker are entitled to qualified, good faith immunity under state law. *See also City of Florence v. Chipman*, 38 S.W.3d 387 (Ky. 2001).

### 2. Superseding/ Intervening Cause

In light of my conclusion that the defendants are entitled to good faith immunity under state law, I decline to reach defendants' alternative argument that no liability can attach because Ms. Hellmann's death was caused by the superseding and intervening event of her ingestion of oxycodone prior to her arrest.

### III. Conclusion and Order

For the reasons state herein, **IT IS ORDERED** that the defendants' motion for summary judgment [DE #31] is **granted** and that this action be stricken from the active docket of this court.

This the 12th day of April 2007.



Signed By:

*J. Gregory Wehrman*

**United States Magistrate Judge**